Good morning. I'd like to start by telling the court what I think this deal with this discussions of the Coturier case or the various counter cases that deal with ESOPs. Unless and until the court is unable to conclude that Judge Rosenbaum fulfilled his, what we think is a fairly limited obligation under the indemnification provision, we respectfully request that this court reverse the order of the district court vacating the arbitration and that you reinstate the arbitration. We believe it should be vacated for several reasons. Initially, we do believe that the case law reflects, and I don't think there's any meaningful disparity here either, a substantial amount of deference. Whether or not we feel constrained by Section 10 only or we go to the other cases which discuss manifest disregard, that standard is still extraordinarily high. There are cases essentially that say as long as any basis can be found as a plausible legal support for the authority or for the legal finding of the arbitrator, then it's going to be sustained. And that's why Multiband was frankly surprised at the lower court proceedings in this case. In part, Multiband was surprised because the district court opinion sets forth what it believed to be a consensus of opinion with regard to these provisions under Section 410A under ERISA. We believe that a fair reading of the briefing that was filed both at the arbitration phase, at the summary judgment phase, as well as the arbitration decision rendered by a retired federal district judge out of Minnesota, that there wasn't any great consensus about whether the provision even applied. That was what was interesting is that Judge Rosenbaum actually said, look, I appreciate both sides' discussion of the case law and whether or not these provisions are valid or not valid. He said, but I don't see the need to even get to that point. He said, I don't even believe that the Department of Labor interpretation is necessary to my decision because quite clearly he was directed, I believe, to rule squarely on the issue of whether or not an indemnity provision was an insurance policy. That was driven in the argument, as you've seen from the hearing before the arbitrator, where there was a pretty lengthy colloquy with both sides about whether or not that constituted insurance. So against that particular backdrop, we maintain in our brief, and I maintain here again, that I am far less concerned with whether or not Judge Rosenbaum, with all due respect to him, got it right or got it wrong. I think what instead this case should be about is whether or not he fulfilled his commitment under the arbitration contract. We referenced that in the reply brief. Counsel, some of your argument, though, was that he was wrong. One can fairly conclude. I think there's both sides. You could conclude he was wrong, Your Honor, that Judge Rosenbaum was wrong in the arbitration. In the arbitration, right. But here I want to be candid what's troubling me. What if we look at this and say this is – the arbitrator is just flatly wrong? It's just – I understand you don't agree with it, which is right. But assume that it's just he's just wrong. But he read the cases wrong and came to the wrong conclusion. What should we do then? You would conclude he has committed serious legal error. And I think you would do what this circuit has done in many other cases and say serious legal error is not enough. I think Judge Rogers – What is enough? That, in part, is for Your Honor to conclude. You're giving us guidance. If we say not very much is enough, then you lose. That's what I'm – that's exactly where I am. I'm here to tell you. That's where I am. I don't know about my colleagues. It's very hard for me – now, we can argue about whether the arbitrator was right or not. But my concern is what if he's just flat-out wrong? If he has the right to be wrong under the arbitration agreement, is that basically the answer? I am not being blithe when I say a party places him or herself or itself at greater risk of the consequences of a wrong decision in the arbitral forum than it does in the normal adjudicate forum. And Your Honor – Sort of forgoes an appeal, basically. No, I'm not being – In a sense, they do. No, because this court has, and as have other courts, have said when it is so wrong, we will take action. So I understand – You mean how wrong does it – what's a sign of being so wrong, I guess? Well, for example, I think it was the Merrill Lynch case against Solway – or no, Merrill Lynch and Jaros. I think there's a reference to whether or not it's irrational, whether or not one cannot raise any plausible defense of it. And what, Judge Rogers, I would respectfully suggest your question leaves out is the fact that if you were to look at the language of Section 410, is it implausible to have an arbitrator conclude that this indemnification provision may purport to relieve of a liability? I don't see how it relieves liability if you have to pay and you just get insurance. It's just hard for me to see if you want to get the merits. Precisely his point. Then get the insurance, right? Get the insurance. Then they got it here, as a matter of fact. They had insurance, they just didn't have enough. So his point is not nonsensical. It's not irrational. It's actually a very literal reading, perhaps more literal than a number of other judges have given that section, to be sure. And I would confess that, Your Honor, absolutely. So are you arguing that we should, in deciding this case, really rely on our prior decision in Coffee Beanery, which says that the award should not be vacated except in certain instances, and those are fairly clear fraud or corruption, misconduct or whatever, and that none of those exist in this situation? And I think that underscores my response to Judge Rogers, Judge Donald. That's exactly how we feel. When you answer that, would you say whether you include manifest disregard as a separate category? Because that's the question, as I understand it, from Judge Donald. Are you saying we're limited to the statutory grounds and our case law regarding manifest disregard is correct? Judge Souter didn't really answer that for us. Justice Souter didn't. I personally believe that the manifest disregard was modifying language of the actual statutory framework, which is much, much narrower. That is my belief, but I also recognize that there have been scores of cases which have still included manifest disregard. Coffee Beanery says it still stands. We were prepared to argue it before Judge Ludington in recognition of the fact that manifest disregard would be a standard that we would have to address. But I think for purposes of even dealing with that manifest disregard standard, I found interesting that the manifest disregard was premised upon what we think was a faulty premise, namely that there is a consensus in the law here. Judge Ludington's opinion was a very lengthy – he very lengthy set out the facts, or in great detail set out the facts. And then he set out some of the maybe two pages' worth of statutory discussion and some legal case law. He never once, I don't think, mentioned the countervailing case law. And, in fact, what I found instructive was that there was a time where he inserted certain legal encyclopedias that I don't think were known or utilized by the appellee at the time of the summary judgment argument. And so, in other words, if it was truly such a consensus, our opinion is then why was that additional authority added? And I think there's a case law that basically says you cannot manifestly disregard unless that particular law is put before you. And so that's how we feel. In other words, he's saying he manifestly disregarded the law, but he inserted a whole bunch of things that Judge Rosenbaum was not asked to consider, a whole bunch of authority he was not presented with. So I think, again, I think the best answer I can give you, Judge Rogers, is I have every reason to respect why an outcome that we ask for could trouble you. Because a lot of people would conclude Judge Rosenbaum got it wrong. But our manifest – pardon me for confusing that word – our belief is he did not get it so very wrong when you consider the language of the statute and how literally he read that. I guess I was just wondering if you could give us some help as to what so very wrong constitutes. It's just a sense of whether it's just egregious, or do we need some indication that he is defying the law, or does he have to say the law says this, but I don't care. I think the law should say that. Well, again, if we had a record that said that, absolutely. That would be, as they say in one of the cases, industrial justice, and I don't think we're having this argument here today if that were the case. But if he said, look, I think the purchase price that multiband paid was too much money. I think you guys rigged the numbers, even though that's really not before me, and I don't think there was consideration for this, so I'm not going to let you have this indemnification provision. Then I think that's a different kettle of fish, Judge Rogers. I think we're having a different discussion. But again, what – Jerry at least tied it to the language of the agreement. I believe when you look at the language of the agreement, he gave the parties what they contracted for. And what did you – what were you negotiating for in entering an indemnification agreement? I'm just thinking of the equities of the issue. How does the other side get the benefit of this bargain? Well, I think at the time they negotiated the indemnification agreement, it was – first of all, negotiation is the wrong term. The way it was described to me, and this did not make it into the record, Judge Stranch, it did not make it into the record. But what has been explained to me was that it was put in there, it was historic language that was used in a couple of other purchases that they had done, and they just adopted it without really paying much attention. In fact, and we did no discovery here. We went right to the summary disposition phase. The fact of the matter is that there was a representation made that said, look, yeah, we have these DOL investigations. And that's the other side of it, Judge Stranch, is that, yeah, we have these DOL investigations, but they're really about wage and tax issues. And that's what I was told. But again, Mr. Barker said, no, we told them very clearly in an email. There was an email that said there were Department of Labor issues that did relate to the fiduciary activities relating to the purchase price of the ESOP shares that were purchased. But the fact of the matter is that they weren't really chewed on very long and very hard. For all the lawyering that got done, this was very, very low on the radar. And it was not until the Couturier case, I think, came down with the very same attorney who dropped the very same language that they said, hey, wait a minute. So that's the best answer I can give you, Judge Stranch, in relation to the equity assessment. I thank the bench for your time. May I ask one other – oh, I'm sorry. One other question. What happens if the assumption agreements are void and the inducement agreements are not? I think then the inducement agreements are – obviously, they are treated differently. But then I would say there was a point in time, and there was a policy on this in the hearing, that DTHC owned a substantial amount of multiband stock. I think at page 43 or 34, Mr. Barr even mentions that we sold it, bought it back at a high price and we may give it back. But the fact is, is the moment DTHC owned stock of multiband, I think the same analysis of Couturier then applies. In other words, it then became void because we believe that a payment by multiband would have impacted DTHC, which would have then impacted DTHC ESOP. That's our answer. Thank you, Your Honor. Thank you, Your Honor. Thank you. Your Honor, may it please the Court. I'm Doug Barr. I represent Bernie Maheny. How wrong is wrong? I want to discuss – and I'll discuss a little bit more later – the Stolt-Nielsen case by the U.S. Supreme Court. In that decision, that was the one that came up in 2010 after this long, several-year-long history about whether or not manifest disregard is still viable means for vacating an arbitration award. And in that case, there was a discussion, as you mentioned, about industrial justice and that sort of thing. But at the guts, that case says this, that when parties to an arbitration agree to an arbitration and the scope of it, they're the ones that empower the arbitrator. That's what happens. And in that case, what happened was that the arbitrators themselves decided to question on the basis of policy that they took evidence on and they mulled it over and they made up their own policy, what they thought was the best public policy, about the question of whether or not arbitration agreements that are – where the parties agree they're silent about whether there can be a class arbitration. Under those circumstances, they came up with their own policy. And what Justice Alito said was, wait a second, the parties themselves have fashioned this arbitration. One of the basic premises of the federal arbitration act is that you can't compel parties to arbitrate something that they haven't agreed to arbitrate. And the parties consented to it or admitted in that case. But here they agreed to arbitration. You're not saying there was no agreement to arbitration. Not one bit. And they would both agree that the arbitration is controlled by the statute. Yeah, absolutely. So it's just the meaning of the statute. They agree that the arbitrator gets to decide how that statute applies to these provisions. I agree. Even if they get it wrong. Well, how wrong? Well, how wrong, that's the question. But it seems to me there has to be something more than just clearly wrong. Because wrong and clearly wrong are sort of the same thing. I agree with you. If you and I agree that it's wrong with a capital W, that's not so wrong. So I don't know what, it seems to me you've got to identify something worse than clearly wrong. I agree. What is it? The point is that Stolt-Nielsen, the point of Stolt-Nielsen, I think, is that the parties don't agree to arbitrate. In our case, we didn't agree that the arbitrator could make up the law. We specifically asked the arbitrator. I'm concerned about that response because what you did is you entered a negotiation, you chose not to come to court, you picked an arbitral entity as a way to settle your disputes, and it is expansive arbitration language. You can't deny that, correct? No. And what you granted this arbitrator was the right to enter any remedy or relief that the arbitrator deems just and equitable. I guess my question becomes you made your bed. You chose that arbitration as the way to settle your disputes, and aren't you caught with that decision unless you can show that you are so far outside this broad arbitration or that the law specifically says when you reach this point, then we're going to override it. And the Act gives you those, but they don't really give you what you're arguing for, do they, the four provisions that say what we can overcome? Yes. The manifest disregard standard, the last word on that was Stolt-Nielsen, and in the footnote number three, Justice Alito had the opportunity to say it doesn't apply anymore, court shouldn't apply it, and he did not do that. What he said was that we don't say whether or not that standard is still around as the loss on Section 10 of the Arbitration Act or as a separate ground for vacating, and then the other side, the respondent argued it, and the court says in the footnote we have it here for the reasons set forth below. So let's look at the standard. Yes. The standard of review is that your job is to show that they were applying clearly established legal precedent that no judge could conceivably come to the same determination, and the other standard that we don't have to affirm the arbitration award is if we can find any line of argument that is legally plausible and supports the award. How can you fit yourself within those very strict standards if the arbitrator's decision has law that supports his theory? Here's how. First of all, there is no law that the arbitrator cited that supports his theory. If you review his decision carefully, literally every page that he cited supports the proposition that indemnity agreements between a fiduciary and a third-party stranger, which is what we stipulated multibanded, to the plan, every one of those cases recognizes that those kinds of agreements are not void ab initio, and this ruling was they are void ab initio. But it's based on the statutory language, right? Yeah. So there's no law in the sense that there's no cases, but you can have law without cases. That's what troubles me. We have judges doing it all the time. They say, well, all these cases say this, but I'm going to say, do I read it? I read that language differently, and they get overturned by the court of appeals, not if they're arbitrary. And this is what he did. This is what he did. He read the statute, Section 410A, as equating exculpatory agreements with indemnity agreements, that they are synonyms, and that, Your Honor, is irrational. It's exactly the opposite of what was concluded in the previous case. But that takes you back, though. That takes you back, Counselor, to an argument where you're saying that the mere fact that the arbitrator either got the law wrong, misapplied the law, or maybe ignored what you believe was the controlling precedent would be grounds to set it aside. And that would not seem to fall within the statutory grounds. It would have to fall under this manifest disregard. But I'm not sure that that is the kind of bar that makes it to the manifest disregard, especially where the area of the law is less than clear as is argued by your adversary. Well, the law is clear. Literally every case that has looked at the question under ERISA, and that's the exact way that we pitched it to the arbitrator, the question we asked him is, under ERISA are agreements between a fiduciary or indemnity with a third party, are they void under ERISA? So we framed that question specifically. But every one of the cases that he cites recognizes that and recognizes the viability of the DOL regulation. Only so long. Yes, I would agree. They recognize the viability of the DOL regulation. But isn't there a pretty serious line of cases that says there is an appropriate theory, particularly in the ESOP arena, if the agreement itself has either a direct or an indirect impact on the finances of the ESOP? There are two cases that he cited. And those, I agree, there are those two cases. Because what you've got to show is a consensus. Yes. So there are two cases on the other side. No, no. There are two cases that say that if the agreement is between the fiduciary and the entity to whom it owes the duty, if that is an indemnity agreement, in other words, we call it an indemnity agreement, but what I'm saying is I have a duty to you and you hereby agree that you will indemnify me if I owe you anything for breaching my duty, that's exactly the same thing as an exculpatory agreement. This arbitrator never got to that point, Your Honor. He decided, without asking the parties, in fact, the parties had stipulated that that's not the case we have here. The parties had stipulated that multiband is a stranger, that multiband is not the plan. In fact, it's not. It's not the plan. It's not the administrator. It's not a fiduciary. Not anything. He decided all of them are. But the question becomes not whether they're a stranger, but whether the format of the deal in which they engage directly or indirectly harms the finances of the ESOP, because that is the issue to which ERISA addresses itself, damage to the assets of an ESOP, correct? I couldn't agree more. I could not agree more. So if the deal that you engaged in impacted, even indirectly, the assets of the ESOP, then you would concede that that's a void agreement, correct? No, I would not, Your Honor. I don't think that the cases go that far. But my point is the arbitrator – But they begin – I'm sorry to interrupt. That's okay. They begin with the concept. Right. And now what we're saying is there's a concept at law that says you may not format your deal in a way that takes assets from the pensions of the ESOP holders. So now the question becomes we have a viable legal theory. How does it apply here? And in that case, aren't you just quibbling with the decision that it does apply here as opposed to quibbling with whether there is a consensus on the theory? Judge, I don't know how to be more clear about the fact that this arbitrator just didn't decide on the basis that if multiband a stranger pays these indemnity agreements, that that affects the assets of the plant. He didn't decide that. He didn't consider that. What he ruled was all indemnity agreements between fiduciaries and third parties are void. Because they're exculpatory. Because they're exculpatory. So he got the word indemnity – he misunderstood the word exculpatory to include indemnity agreements regardless of whether there's an effect. So the question becomes to me the standard of review and whether we as judges can find any line of argument that is legally plausible and supports the award. So I'm still struggling with why this indirect financial impact is not a legally viable theory that supports this agreement. Because the party stipulated the fact. You didn't stipulate to whether there was no financial impact. All you did was stipulate that you had an independent stranger. But that begs the question, doesn't it? Isn't the question whether that independent stranger has entered an agreement that harms the finances of the ESA? Even the Courtier case says this, that in that case the plant's assets were entirely stock of the sponsor company and the sponsor company's assets had been liquidated to cash. And therefore – and there was an agreement between the sponsor company to identify the fiduciary. And the fiduciary had asked if it provided for advancement or provided defense to me. And the fiduciary had asked for advancement. Hey, I'm defending myself in this lawsuit about breach of fiduciary duty. I want my attorney fees. So the DOL made a motion to enjoin the payment. And the court goes through the analysis and says, because this is literally dollar for dollar, the only cases that ever have held that an agreement between a fiduciary and someone who's related to the plant, in this case the sponsor agreement or the sponsor company, are in fact exculpatory are those cases like Courtier where it was literally a dollar for dollar, even though nominally it's the sponsor company paying. But Fernandez steps forward and says whether the financial impact is direct or indirect. It does say that, Judge. But again, there literally were no facts before this arbitrator pertaining to that. So it's just like Mr. Concanon said. If he had said, hey, I want to go outside the record and decide something on the basis of something that I'm just thinking outside the record, that's what that decision would be. If he had decided this has an indirect impact – I mean, Mr. Concanon admitted at our oral argument on this that there wasn't any direct impact, that there wasn't any ownership of multiband stock by the ESOP, that there wouldn't be. Well, what he admitted was that the ESOP did not hold the multiband stock. Is that necessarily an admission that there's not a financial impact? Because the holding company held that stock. And if the holding company either got less cash because of the indemnity agreement or took stock that was devalued because you had to pay the indemnity, 55 percent of that holding company is the entire asset base of the ESOP. So how could it not have an indirect or even a direct financial impact? It could well not. We don't know anything, and the arbitrator didn't know anything about multiband. The publicly traded company didn't know anything about what multiband's finances were. It's like saying – He knows what was paid in. Let's put multiband's assets to the side. You've got somebody who says the Schaeffer and Blatt say, I don't want more money to go into the holding company. I want to be indemnified. You stipulated that. So they say that their interest at that very point is in indemnifying themselves, not in getting more money into the holding company. If they got – let's say it was $1 million, $10 million, whatever, the difference in the price because they got their indemnity, then that's less cash, that dollar-for-dollar amount into the holding company. Fifty-five percent of the holding company is the ESOP. That's all it holds. So if you've reduced that by $1 million or $10 million, you've reduced the assets of the ESOP in order to protect those fiduciaries. Isn't that correct? I don't think so, and here's why. I don't know what stock the sponsor company held apart from its own stock. I don't know what stock. But it could have held stock in AIG, for example. And it has an insurance – and our clients could have had an insurance – a separate insurance agreement that they took their own money out and paid for with AIG. Every dollar AIG has to pay on an insurance policy reduces the assets of AIG. So according to that factual – there is a legal theory that says if you can demonstrate that it's a dollar-for-dollar reduction, then that is exculpatory. But this is a factual theory that we're talking about now. And every dollar that AIG would pay on its insurance policy would reduce AIG's assets, which would then theoretically – and maybe it's like pouring a cup of water in the ocean – but at least theoretically reduce the value of the holdings of the sponsor company. That isn't what we have here, and that's not what the law is in these circumstances. If this arbitrator had said, no, I'm concerned about this, I'm going to follow the Baylor case, and every case that has been decided I'm going to follow and say that indemnity agreements might well be viable. They're not void ab initio. That's what he held. I'm going to follow all those cases, and you know what? We're going to have another hearing to determine whether or not, as a factual matter, whether or not if Multiband pays this indemnity to Bernie and Henry, which they bargained for in exchange to get Bernie and Henry to agree to sell them stock five years after the fiduciary matter, I'm going to have a hearing on the facts of that and try to figure that out. That would be different. Here that did not happen. What we have is an arbitrator who saw – if there was ever a – I think that answers her question, and I have a follow-up question. I know you're out of time, but if it's okay. I want to assume for the moment that your responses to Judge Stranch are correct. I just assume for the moment that they're correct. It seems to me you still have a problem, and that is what the arbitrator did, you would argue, is just misread the word exculpatory to include indemnity. He just misread the law. Is that fair? I would say that that's the same as saying the statute says read, which I understand it to be – it's irrational. Is that if they say I read read to mean Sapphire and Teal and Azure? That's reading it. It's not manifestly disregarding the law. It's reading the law wrong. When you get somebody who has to interpret the word read, if he interprets it as Azure and Teal and Sapphire, that's what you've got. That's reversible error. He read the word read wrong. Is that a manifest disregard of the law? Let me answer that question by referring to the Coffee Beanery case. It's an unpublished case in our circuit. I understand, but in that case it was concluded that the reading of a statute, the Maryland Franchise Statute requiring disclosure of a felony of a certain crime, it was manifest disregard of the law to conclude that grand larceny wasn't of the kind that was in that – of the felonies listed in that statute. This is worse than that. What this arbitrator did was irrationally read the statute. The red means blue. That is just not logical. It's irrational. Then he decided this. So it's got to be irrational. Yes, and then he decided this. He did exactly what the court said was you should not do in Stolt-Nielsen. He implied his own public policy by saying – You can say he applied policy, but if he just didn't know what exculpatory means, a lot of people don't, and didn't get it argued clear enough to him to figure out exactly what it does mean, I don't mean to say that's exactly what happened, but if that were to happen, it would seem to me that's misunderstanding the law, not manifestly disregarding the law. Judge, I invite you to review a footnote in the arbitration decision where the arbitrator says that at the heading for Section 410A says exculpatory provisions, and in a footnote he says, I know it says exculpatory provisions, but I'm not bound by what the title is to the statute. I'm not bound by that. So he knew what exculpatory meant and deliberately decided that indemnity is a synonym for exculpatory, which if I go out after I leave the courtroom today and I owe a duty to the public to drive safely and I happen to run through a red light and run into somebody, they're going to be surprised to know that I've been exculpated by my insurance policy from my car insurance company and that I don't owe them anything because I've been exculpated. Okay. Thank you. Thank you. Good morning again. I have very little. In light of the length of the discussion, I would be remiss if I didn't remind the panel that I think the discussion with Mr. Barr underscores one obvious point. Mr. Block and Mr. Shaffer got that they bargained. They got an arbitrator who I think heard the law, considered the law, and appropriately cited the law. The best case scenario for them is that the judge may have misread the law, and I think that lengthy policy was very instructive, or at least I would hope it would be. And I was also struck by the fact that there was a discussion, I don't know with which of your honors, about judges misread the law all the time and they have the opportunity to come into a court like this and seek redress. This was a contractually bargained for and very expansive arbitration agreement. There was legal authority for Judge Rosenbaum's ruling. And again, it was a very narrow reading of the statute, but it's not a logical reading of the statute. It's not an irrational reading of the statute. And he didn't manifestly disregard the statute. He read the statute. It's a reading which seems to make impossible ordinary insurance. I'm sorry? It's a reading which seems to make impossible ordinary insurance. It's pretty close to red means blue, isn't it? No, I don't think so. And again, Your Honor, I think you're— I mean, apart from all this about whether it is a third party. Assuming it's a true third party. But you're discounting the fact that there's another part of the statute that directly addresses insurance. I don't think it's irrational to conclude if you wanted to say that you're insurance, then you fall within these three sections of 2B, I believe it is. And they didn't. Is that an irrational conclusion? No, and I don't think that they're arguing that they qualified for following in those classifications. They simply say that the practical effect of this was that it wasn't. You're talking about whether exculpatory includes indemnity. I don't think—I don't agree that he necessarily confused those terms. If he ended up treating in his ruling summarily them in a way that they interpret that to mean that, I respect that opinion, but I don't think that he intentionally said that. He simply said, I'm not bound by a heading that I don't think is necessarily applicable. That's what he said in the footnote. He didn't say, I agree that exculpatory and indemnification or indemnity are the same things. Unless the panel has any further questions, I thank the Court for its time. Thank you. Case please submitted.